[Crim. No. 4992. In Bank. Apr. 21, 1950.]

THE PEOPLE, Respondent, v. DAVID KNOWLES, Appellant.

Rosalind G. Bates and Aileen M. MacLymont for Appellant.

Fred N. Howser, Attorney General, and Henry A. Dietz, Deputy Attorney General, for Respondent.

TRAYNOR, J.—Defendant and Caryl Chessman were jointly charged by information with two counts of armed robbery, two counts of kidnapping for the purpose of robbery, and one count of grand theft. Defendant waived a jury and was tried separately. The trial court found him guilty on both counts of robbery and both counts of kidnapping, but not guilty on the count of grand theft. It determined that one kidnapping involved bodily harm to the victim and sentenced appellant to life imprisonment without possibility of parole. The sentences on the other offenses were to run concurrently. Defendant appeals from the judgment of conviction and the order denying his motion for a new trial, contending that the evidence is insufficient to establish his guilt and that armed robbery is not punishable as kidnapping under Penal Code, section 209.

On January 23, 1948, at about 6:30 p.m., defendant and Chessman entered a clothing store in Redondo Beach. There was no one in the store except the owner Melvin Waisler and Joe Lesher, a clerk. Defendant asked to look at overcoats and Lesher showed him several while Chessman sat nearby and Waisler walked around the store. The accused stood in a well-lighted area, and Waisler and Lesher testified that they were able to get a good look at them. Shortly thereafter, defendant and Chessman displayed guns, saying "this is a stick-up, put up your hands." They compelled Waisler and Lesher to enter a stockroom in the rear of the store and face the wall, and then took their wallets. Defendant held them at gunpoint in the stockroom while Chessman took some clothes and attempted to open the cash register. He returned to the stockroom, forced Lesher to come back and open the register for him, and took money therefrom, after which he returned Lesher to the stockroom. Defendant struck Waisler on the head with the barrel of his gun, and then left with Chessman. Waisler and Lesher ran to the front of the store in time to see defendant and Chessman escaping in a gray 1946 Ford coupé. They then notified the police.

About an hour later, two police officers in a radio car observed the gray Ford proceeding in a northerly direction on Vermont Avenue in Los Angeles, about half a block south of Hollywood Boulevard. They pursued the Ford and saw Chessman, who was driving, turn into a service station, circle it and drive out. The Ford proceeded south at high speed for about a mile, and when Chessman then attempted a U-turn the officers drove their car into the side of the Ford. Both men ran from the car but were quickly caught. The officers found the stolen clothing and a .45 automatic in the rear of the Ford. Chessman had about $150 on his person and defendant $8.00.

To establish an alibi, defendant produced Miss Ann Stanfield who testified that he visited her at her residence in Hollywood at about 6 p.m. on the evening of the robbery and that he remained there for about 15 or 20 minutes. If her testimony were true, appellant could not have been in Redondo Beach, 23 miles distant, at the time of the robbery. Defendant testified that he met Chessman by appointment at the corner of Vermont Avenue and Sunset Boulevard at about 7 p.m. on the evening of the robbery. He testified that there was a man in the car at the time introduced to him by Chessman as Joe, and that Joe rode with them when the police

pursuit began, but got out of the car at the service station and ran into the rest room while Chessman and appellant drove off. Chessman corroborated defendant's story.

The foregoing testimony was contradicted in every material detail by witnesses for the prosecution. Waisler and Lesher positively identified defendant as a participant in the robbery. The officers testified that they had the car in plain view at all times, that there were only two occupants, and that they saw none leave it at the station. The direct conflict in the evidence was resolved by the trial court in favor of the People.

Defendant contends that Waisler's and Lesher's identification of him does not establish his guilt beyond a reasonable doubt, because the identification was not by means of a standard police line-up, and because they made the identification after being informed by the police that the robbers had been caught and after they saw defendant's picture in the newspapers upon his arrest in company with Chessman, "a famous bandit." It is for the trier of facts to weigh the evidence relating to identification and to resolve the conflicts therein. His acceptance of an identification not inherently improbable must be upheld if there is substantial evidence to support it, even though the contradictory evidence, if believed, would have induced a contrary result. (*People* v. *Waller,* 14 Cal.2d 693, 700 [96 P.2d 344] ; *People* v. *Braun,* 14 Cal.2d 1, 5 [92 P.2d 402] ; *People* v. *Farrington,* 213 Cal. 459, 463 [2 P.2d 814] ; *People* v. *Ash,* 88 Cal.App.2d 819, 825 [199 P.2d 711] ; *People* v. *Alexander,* 78 Cal.App.2d 954, 957 [178 P.2d 813] ; *People* v. *Tanner,* 77 Cal.App.2d 181, 186 [175 P.2d 26] ; *People* v. *Deal,* 42 Cal.App.2d 33, 36 [108 P.2d 103].) Substantial evidence of defendant's guilt leaves his first contention without merit.

Defendant also contends that the crime of which he was convicted is only armed robbery, and that Penal Code section 209 cannot properly be construed as applicable to that crime. In his view, the statute applies only to orthodox kidnapping for ransom or robbery, not to the detention of the victim during the commission of armed robbery. This interpretation of section 209 finds no support in its language or legislative history; it could not be sanctioned without a *pro tanto* repeal by judicial fiat.

Defendant concedes that the language of the statute does not in its ordinary sense support his interpretation. Under that language one accused of armed robbery who has inflicted

bodily harm on the victim, can be charged with a capital offense. Reasonable men may regard the statute as unduly harsh and therefore unwise; if they do, they should address their doubts to the Legislature. It is not for the courts to nullify a statute merely because it may be unwise. "We do not pause to consider whether a statute differently conceived and framed would yield results more consonant with fairness and reason. We take this statute as we find it." (Cardozo, J., in *Anderson* v. *Wilson*, 289 U.S. 20, 27 [53 S.Ct. 417, 77 L.Ed. 1004].)

Before its amendment in 1933, Penal Code, section 209 provided that "Every person who maliciously, forcibly or fraudulently takes or entices away any person with intent to restrain such person and thereby to commit extortion or *robbery*, or exact from the relatives or friends of such person any money or valuable thing" (italics added) shall be punished by imprisonment for life or for a minimum of ten years. The 1933 amendment made the punishment, where the victim suffered bodily harm, death or life imprisonment without possibility of parole. At the same time, however, the Legislature redefined the offense to encompass "Every person who *seizes, confines,* inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever *with intent to hold or detain, or who holds and detains,* such individual for ransom, reward or to commit extortion or robbery. . . ." (Italics added.) The addition by amendment of the italicized words is a deliberate abandonment of the requirement of movement of the victim that characterized the offense of kidnapping proscribed by section 209 before the amendment. By that amendment the Legislature "changed the offense theretofore described in section 209 from one which required the asportation of the victim to one in which the act of seizing for ransom, reward or to commit extortion or robbery became a felony." (*People* v. *Raucho,* 8 Cal.App.2d 655, 663 [47 P.2d 1108].)

The trial court found on substantial evidence that defendant restrained Waisler and Lesher in the stockroom for about fifteen or twenty minutes and inflicted bodily harm on Waisler during the detention, while his confederate Chessman rifled the cash register. That conduct is clearly covered by the words of section 209 given their plain meaning. Webster's New International Dictionary, Unabridged Edition (1943), defines "seize" as "To take possession of by force," and "confine" as "To restrain within limits; to limit; . . . to

shut up; imprison; to put or keep in restraint . . . to keep from going out.'' Clearly a person is taken possession of by force when he is compelled to enter a room at the point of a gun, as in this case. He is also restrained within limits, shut up, and kept from going out when he is forced to remain in that room for fifteen or twenty minutes. That he is held and detained thereby and that such detention was the purpose of the seizure and confinement is readily apparent. There can be no doubt therefore that defendant and Chessman *seized* and *confined* the two victims with intent to hold and detain them or that they *held and detained* ''such individual[s]'' (the victims seized and confined) to commit robbery.

Defendant concedes that asportation of the victim is not an essential element of section 209, but he contends that the Legislature intended that the statute apply only to acts of seizure and confinement incident to a ''traditional act of kidnapping.'' The Legislature, however, has broadened the statutory prohibition to include not only the seizure and confinement of an individual in a traditional act of kidnapping (for ransom or reward), but also the seizure and confinement of an individual for the purpose of robbery, a purpose foreign to ''traditional kidnapping'' as defined by defendant. It is therefore idle to suggest that conduct aptly described by the statute is not punishable thereunder. (*People* v. *Raucho, supra,* 8 Cal.App.2d 655, 663.)

There is no question that the Legislature has the power to define kidnapping broadly enough to include the offense here committed and to prescribe the punishment specified in section 209. Subject to the constitutional prohibition of cruel and unusual punishment, the Legislature may define and punish offenses as it sees fit. (*People* v. *Lavine,* 115 Cal.App. 289, 297 [1 P.2d 496], appeal dismissed, *Lavine* v. *California,* 286 U.S. 528 [52 S.Ct. 500, 76 L.Ed. 1270].) It may define and punish as kidnapping an offense that other states regard only as armed robbery. Section 209 establishes that definition as the law of California. (*People* v. *Tanner,* 3 Cal.2d 279, 296 [44 P.2d 324].) The statutory definition of the proscribed offenses is not rendered uncertain or ambiguous because some of the prohibited acts are not ordinarily regarded as kidnapping. When the Legislature has made such acts punishable as kidnapping, this court should not impute to the statute a meaning not rationally supported by its wording. ''The judgment of the court, if I interpret the reasoning aright, does not

rest upon a ruling that Congress would have gone beyond its power if the purpose that it professed was the purpose truly cherished. The judgment of the court rests upon the ruling that another purpose, not professed, may be read beneath the surface, and by the purpose so imputed, the statute is destroyed. Thus the process of psycho-analysis has spread to unaccustomed fields. There is a wise and ancient doctrine that a court will not inquire into the motives of a legislative body.'' (Cardozo, J., dissenting in *United States* v. *Constantine*, 296 U.S. 287, 298-299 [56 S.Ct. 223, 80 L.Ed. 233]; *Smith* v. *Union Oil Co.*, 166 Cal. 217, 224 [135 P. 966]; *City of Eureka* v. *Diaz*, 89 Cal. 467, 469-470 [26 P. 961]; *Callahan* v. *City and County of San Francisco*, 68 Cal.App.2d 286, 290 [156 P.2d 479].) ▮ The will of the Legislature must be determined from the statutes; intentions cannot be ascribed to it at odds with the intentions articulated in the statutes. Section 209 clearly prohibits and punishes the offense committed by defendant; there is no basis for supposing that the Legislature did not mean what it said.

An insistence upon judicial regard for the words of a statute does not imply that they are like words in a dictionary, to be read with no ranging of the mind. They are no longer at rest in their alphabetical bins. Released, combined in phrases that imperfectly communicate the thoughts of one man to another, they challenge men to give them more than passive reading, to consider well their context, to ponder what may be their consequences. Speculation cuts brush with the pertinent question: what purpose did the Legislature seek to express as it strung those words into a statute? The court turns first to the words themselves for the answer. It may also properly rely on extrinsic aids, the history of the statute, the legislative debates, committee reports, statements to the voters on initiative and referendum measures. Primarily, however, the words, in arrangement that superimposes the purpose of the Legislature upon their dictionary meaning, stand in immobilized sentry, reminders that whether their arrangement was wisdom or folly, it was wittingly undertaken and not to be disregarded.

''While courts are no longer confined to the language [of the statute], they are still confined by it. Violence must not be done to the words chosen by the legislature.'' (Frankfurter, *Some Reflections on the Reading of Statutes,* 47 Columb. L.Rev. 527, 543.) A standard of conduct prescribed by a statute would hardly command acceptance if the statute were

given an interpretation contrary to the interpretation ordinary men subject to the statute would give it. "After all, legislation when not expressed in technical terms is addressed to the common run of men and is therefore to be understood according to the sense of the thing, as the ordinary man has a right to rely on ordinary words addressed to him." (*Addison* v. *Holly Hill Fruit Products Co.*, 322 U.S. 607, 618 [64 S.Ct. 1215, 88 L.Ed. 1488] ; see, also, *McBoyle* v. *United States,* 283 U.S. 25, 27 [51 S.Ct. 340, 75 L.Ed. 816].) ■ If the words of the statute are clear, the court should not add to or alter them to accomplish a purpose that does not appear on the face of the statute or from its legislative history. (*Matson Nav. Co.* v. *United States*, 284 U.S. 352, 356 [52 S.Ct. 162, 76 L.Ed. 336] ; *State Board of Equalization* v. *Young's Market Co.*, 299 U.S. 59, 62-64 [57 S.Ct. 77, 81 L.Ed. 38] ; *United States* v. *Johnson*, 221 U.S. 488, 496 [31 S.Ct. 627, 55 LEd. 823] ; *In re Miller*, 31 Cal.2d 191, 198-199 [187 P.2d 722] ; *Caminetti* v. *Pacific Mut. Life Ins. Co.*, 22 Cal.2d 344, 353-354 [139 P.2d 908] ; *Seaboard Acc. Corp.* v. *Shay*, 214 Cal. 361, 369 [5 P.2d 882] ; *People* v. *Stanley*, 193 Cal. 428, 431 [225 P. 1] ; *Mulville* v. *City of San Diego*, 183 Cal. 734, 739 [192 P. 702] ; *Gordon* v. *City of Los Angeles*, 63 Cal.App.2d 812, 816 [147 P.2d 961] ; *People* v. *One 1941 Buick 8*, 63 Cal.App.2d 661, 667 [147 P.2d 401] ; *People* v. *Pacific Guano Co.*, 55 Cal. App.2d 845, 848-849 [132 P.2d 254] ; see, also, *De Sloovere, The Equity and Reason of a Statute*, 21 Cornell L.Quar. 591, 605, *Contextual Interpretation of Statutes*, 5 Fordham L.Rev. 219, 221, 230 ; *Extrinsic Aids in the Interpretation of Statutes*, 88 Univ. of Penn. L.Rev. 527, 531, 538 ; Cox, *Learned Hand and the Interpretation of Statutes*, 60 Harv.L.Rev. 370, 374-375 ; Jones, *Statutory Doubts and Legislative Intention*, 40 Columb.L.Rev. 957, 964, 974, and *Extrinsic Aids in the Interpretation of Federal Statutes*, 25 Wash.U.L.Q. 2, 8, 9.) Certainly the court is not at liberty to seek hidden meanings not suggested by the statute or by the available extrinsic aids. (*In re Miller*, 31 Cal.2d 191, 198-199 [187 P.2d 722], and cases cited therein.)

Defendant's interpretation of the statute rests entirely upon speculation. It finds no support in the statutory language or its contextual implications or in the legislative history of the statute. He relies upon the wave of public indignation at the widespread kidnapping for ransom during the early 1930's as a motivation for the statute. He takes no account of the equally rampant and terrorizing armed

robbery that compelled the attention of state legislatures at the same time. There is no reason to suppose that the latter evil was not in the minds of the authors of the statute, particularly in view of the retention of the "to commit . . . robbery" provision. The contention that only orthodox kidnapping for ransom was contemplated by the statute is hardly tenable in view of the broad scope of the federal Lindbergh Law that served as a model for the revision of section 209. The federal statute did not limit its prohibition to kidnapping for the purpose of ransom or reward. It (Act of May 18, 1934, ch. 301, 48 Stat. 781, 18 U.S.C. § 408a) provides a discretionary death penalty for the transportation in interstate commerce of a person "held for ransom or reward *or otherwise.*" (Italics added.) The holding of an officer to prevent the arrest of his captor, although admittedly not within the concept of orthodox kidnapping for ransom or pecuniary benefit, was held punishable under the statute. (*Gooch* v. *United States,* 297 U.S. 124, 126 [56 S.Ct. 395, 80 L.Ed. 522].)

Since 1901, the Legislature has included robbery as one of the purposes of kidnapping prohibited under section 209. There is no indication that in making the penalty therefor more severe and the concept of the crime so broad that movement of the victim was no longer required, the Legislature intended to apply these provisions only to kidnapping for ransom or reward. "Familiar legal expressions in their familiar legal sense" (*Henry* v. *United States,* 251 U.S. 393, 395 [40 S.Ct. 185, 64 L.Ed. 322]) used by the Legislature indicates the contrary, that the broad coverage was intended.

Given the unequivocal language of the statute, there is no merit to defendant's contention that the Legislature did not intend to change the substantive nature of the existing crime. Certainly that contention finds no support in any of the cases decided under the statute. In *People* v. *Tanner,* 3 Cal.2d 279 [44 P.2d 324], the defendants forced the victim to go from his driveway to his house at gunpoint and there questioned him about the location of money that they had heard was on the premises. On appeal from their conviction under section 209, they contended that their offense was only armed robbery and that the Legislature did not intend to punish it under a kidnapping statute. The court affirmed the conviction, holding that the Legislature is empowered to define criminal offenses as it sees fit and that the statute clearly indicates an intention to punish standstill kidnapping under its provisions. It is suggested that under the statute there must

be movement of the victim, under a preconceived plan for protracted detention to obtain property that would not be available in the course of ordinary armed robbery. Defendant seeks to read into the statute a condition that the victim be moved a substantial distance. The statute itself is a refutation of that contention. Movement of the victim is only one of several methods by which the statutory offense may be committed. The statute provides that "Every person who seizes, confines . . . or who holds or detains [any] individual . . . to commit extortion or robbery . . . is guilty of a felony." It is contended that the statute cannot properly be read with the omissions indicated, for all that is then left is "cautious legal verbiage" of no significance. The statute, however, sets forth the conditions as alternative ones, and only one need be present. Thus, under a statute providing that the victim be seized or abducted, a defendant who has seized a victim cannot claim exemption from the statute because he has not also abducted him.

 There is no condition in the statute that kidnapping be premeditated as part of a robbery or that robbery be premeditated as part of a kidnapping. In *People* v. *Brown,* 29 Cal.2d 555, 558-559 [176 P.2d 929], this court rejected an attempt to read into the statute a condition that the robbery be premeditated, where the defendant abducted a woman to commit rape. After raping her, he took her wristwatch. A finding that the victim suffered bodily harm was supported both by the forcible rape and by the fact that the defendant subsequently struck her. The judgment imposing the death penalty was affirmed on the ground that the taking of the wristwatch made the abduction kidnapping to commit robbery, even if the original objective were rape and the intent to rob was only an afterthought. (See, also, *People* v. *Kristy,* 4 Cal.2d 504 [50 P.2d 798]; *People* v. *Holt,* 93 Cal.App.2d 473, 476 [209 P.2d 94]; *People* v. *Melendrez,* 25 Cal.App.2d 490 [77 P.2d 870]; *People* v. *Johnston,* 140 Cal.App. 729 [35 P.2d 1074].)

*Chatwin* v. *United States,* 326 U.S. 455 [66 S.Ct. 233, 90 L.Ed. 198], affords no support for appellant's contention. In that case, a conviction under the Federal Kidnapping Act of a member of a plural marriage sect for the interstate transportation of his 15-year-old "celestial spouse" was reversed on the ground that the record failed to show that the girl was held against her will as required by the act. "But the broad-

ness of the statutory language does not permit us to tear the words out of their context, using the magic of lexigraphy to apply them to unattractive or immoral situations *lacking the involuntariness of seizure and detention which is the very essence of the crime of kidnapping. Thus, if this essential element is missing, the act of participating in illicit relations or contributing to the delinquency of a minor or entering into a celestial marriage, followed by the interstate transportation, does not constitute a crime under the Federal Kidnapping Act."* (*Chatwin* v. *United States*, 326 U.S. 455, 464 [66 S.Ct. 233, 90 L.Ed. 198]. Italics added.) There is no intimation that had the restraint been forcible, the transportation would not have been within the broad meaning of the "or otherwise" clause of the federal act. ▆ Similarly, in a case likes the present one, where the seizure and restraint are clearly forcible and the purpose of the seizure is robbery, the offense is kidnapping within the meaning of section 209.

▆ Defendant's convictions for violation of Penal Code, section 209 (kidnapping) and Penal Code, section 211 (robbery) both rest upon the commission of a single act: the taking of personal property in the possession of Waisler and Lesher from their persons and in their immediate possession by force and fear\*, namely, by seizing and confining them under force of arms. The seizure and confinement were an inseparable part of the robbery. Penal Code section 654 provides: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one; an acquittal or conviction and sentence under either one bars a prosecution for the same act or omission under any other." If the two offenses committed by the same act are such that the commission of one is necessarily included in the commission of the other, the defendant can be punished only for the commission of one. (*People* v. *Greer*, 30 Cal.2d 589, 596 [184 P.2d 512] : "Where an offense cannot be committed without necessarily committing another offense, the latter is a necessarily included offense." The use of a minor to transport narcotics (Health & Saf. Code, § 11714) necessarily contributes to the delinquency of that minor (Welf. & Inst. Code, § 702). Section 654 re-

---

\*Penal Code, section 211: "Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."

quires that the defendant be punished only for one of those offenses. (*People* v. *Krupa,* 64 Cal.App.2d 592, 598 [149 P.2d 416].) Similarly the commission of statutory rape necessarily contributes to the delinquency of the minor victim and a defendant cannot be punished for violation of both statutes on the basis of the one act. (*People* v. *Greer,* 30 Cal. 2d 589, 596 [184 P.2d 512].)

But the applicability of section 654 is not limited to necessarily included offenses. If a course of criminal conduct causes the commission of more than one offense, each of which can be committed without committing any other, the applicability of section 654 will depend upon whether a separate and distinct act can be established as the basis of each conviction, or whether a single act has been so committed that more than one statute has been violated. If only a single act is charged as the basis of the multiple convictions, only one conviction can be affirmed, notwithstanding that the offenses are not necessarily included offenses. It is the singleness of the act and not of the offense that is determinative. A statute providing for the punishment of any person operating a "still" or having a "still" in his possession (Stats. 1927, ch. 277, p. 497) states two distinct offenses: operation and possession. If, however, the only act of possession is that necessarily incident to the operation, only one conviction can be affirmed. (*People* v. *Clemett,* 208 Cal. 142, 146 [280 P. 681].) An unsuccessful attempt at murder by use of a bomb may form the basis for convictions of attempted murder, assault with intent to kill, or malicious use of explosives. Insofar as only a single act is charged as the basis of the convictions, however, the defendant can be punished only once. (*People* v. *Kynette,* 15 Cal.2d 731, 762 [104 P.2d 794].) The possession of narcotics is an offense distinct from the transportation thereof, but there can be only one conviction when a single act of transportation is proved and the only act of possession is that incident to the transportation. (*Schroeder* v. *United States,* 7 F.2d 60, 65.) In *People* v. *Greer,* 30 Cal.2d 589, 600 [184 P.2d 512], the defendant was charged with the violation of Penal Code, section 261(1), and Penal Code, section 288. Both charges were based upon a single act of sexual intercourse with a girl under 14. It is possible to violate either statute without violating the other, and this court there stated that if the commission of separable and distinct acts were charged, although they might have been committed at relatively the same time, the convictions of both offenses would

be upheld. If, as in that case, however, the violation of both statutes is predicated on the commission of a single act of sexual intercourse, Penal Code, section 654, requires that the defendant be punished under only one statute.

The distinction recognized in *People* v. *Greer, supra,* has permitted the affirmance of multiple convictions in cases in which separate and divisible acts have been proved as the basis of each conviction, even though those acts were closely connected in time and were part of the same criminal venture. In *People* v. *Slobodion,* 31 Cal.2d 555, 561-563 [191 P.2d 1], this court sustained convictions under Penal Code, sections 288 and 288a, based upon a course of conduct with a young girl where the commission of a separate act as the basis of each offense was proved. (See, also, *People* v. *Pickens,* 61 Cal.App. 405, 407 [214 P. 1027]; *People* v. *Ciulla,* 44 Cal.App. 725 [187 P. 49].) In *People* v. *Ciulla, supra,* the court sustained convictions for kidnapping under Penal Code, section 207, and forcible rape, both offenses having been committed upon the same girl, for the reason that the acts charged were separate and divisible and were connected only by the fact that they were part of a single criminal venture.

Since defendant's convictions were predicated upon the commission of a single act, he cannot be subjected to punishment for both offenses under the rule of *People* v. *Greer, supra.* Defendant committed no act of seizure or confinement other than that necessarily incident to the commission of robbery. Waisler and Lesher were restrained only while the actual taking of personal property was being accomplished. No separate act not essential to the commission of the robbery was charged or proved. For that reason, there is no inconsistency between this case and those in which this court has affirmed multiple convictions of kidnapping and robbery. In each of those cases, the acts that formed the basis of the kidnapping conviction were separate from those that involved the actual taking of property. In *People* v. *Brown,* 29 Cal.2d 555 [176 P.2d 929], the defendant forced his victim to drive a considerable distance to the outskirts of the city where they stopped and he raped her. While she was dressing, he took her wristwatch. The abduction or carrying away upon which the kidnapping conviction was based was separable from the robbery and not essential to its commission. In *People* v. *Dorman,* 28 Cal.2d 846 [172 P.2d 686], the defendants drove their victim about for several hours without attempting robbery, then murdered him and only thereafter took his money.

Again, the act of kidnapping was separable from the commission of robbery. (See, also, *People* v. *Pickens*, 61 Cal.App. 405, 407 [214 P. 1027].) In *People* v. *Kristy*, 4 Cal.2d 504 [50 P.2d 798], the defendants robbed their victims and then kidnapped them to accomplish their escape from prison. In *People* v. *Pearson*, 41 Cal.App.2d 614 [107 P.2d 463] (habeas corpus denied, *In re Pearson*, 30 Cal.2d 871 [186 P.2d 401]), the defendant robbed X and thereafter forced Y and Z to drive him away in an attempt to escape. He was convicted of the robbery of X and the kidnapping of Y and Z. In *People* v. *Tanner*, 3 Cal.2d 279 [44 P.2d 324], the defendants first took the valuables that formed the basis of the robbery conviction and thereafter confined their victims and tortured them in an unsuccessful attempt to secure information as to the location of other property.

Unlike the defendants in the foregoing cases, Knowles committed no act of kidnapping that was not coincident with the taking of personal property. There was no seizure or confinement that could be separated from the actual robbery as a separate and distinct act. Since he committed only a single, indivisible act, Penal Code, section 654, requires that he be punished only once therefor. In view of the fact that the Legislature prescribed greater punishment for the violation of section 209 it must be deemed to have considered that the more serious offense, and the convictions thereunder must be the ones affirmed. (*People* v. *Kehoe*, 33 Cal.2d 711, 716 [204 P.2d 321]; *People* v. *Chapman*, 81 Cal.App.2d 857, 866 [185 P.2d 424]; *People* v. *Degnen*, 70 Cal.App. 567, 578 [234 P. 129]; *Durrett* v. *United States*, 107 F.2d 438, 439; *Hewitt* v. *United States*, 110 F.2d 1, 10-11; *People* v. *Goggin*, 281 N.Y. 611 [22 N.E.2d 174], aff'g 10 N.Y.S.2d 586, 587; *People* v. *Heacox*, 231 App.Div. 617 [247 N.Y.S. 464, 466].)

The order denying the motion for a new trial is affirmed. The judgments of conviction of kidnapping for the purpose of robbery are affirmed, and the judgments of conviction of armed robbery are reversed.

Shenk, J., Schauer, J., and Spence, J., concurred.

EDMONDS, J.—By the present decision, "the detention of a victim during the commission of armed robbery" constitutes kidnaping, and although "[d]efendant committed no act of seizure or confinement other than that necessarily incident to the commission of robbery," he may be prosecuted

either for robbery or for kidnaping at the election of the district attorney. As I read section 209 of the Penal Code, it neither compels nor warrants this construction, and it is a startling innovation in criminal law that an act which constitutes robbery is also kidnaping.

Under the law now stated, the crime of kidnaping may merge into the crime of robbery. In its practical operation, where one is convicted of robbery only, he may be imprisoned for a period of from five years to life. If he is convicted only of kidnaping, under certain circumstances he may be confined for life, with the possibility of being released upon parole. But if he is guilty not only of kidnaping but also of robbery, since under section 654 of the Penal Code he cannot be punished for both crimes, his term of imprisonment may be only for the period prescribed for one of them.

Thus one who also robs will receive no greater punishment than the criminal who does nothing more than kidnap a person. This is a clear invitation to the kidnaper. He has nothing to lose if he also takes property from his victim's person or immediate presence by means of force or fear (Penal Code, § 211). Under the present decision, if prosecuted for both kidnaping and robbery, punishment can be imposed only for kidnaping. Otherwise stated, instead of being subject to imprisonment upon two sentences, each of which may be for life with the possibility of parole and, in practical effect terms of confinement for years, he can only be given one such sentence, with consequent reduction in the time to be served in prison. The fact that Knowles will be subject to imprisonment for life without the possibility of parole under one of the sentences for kidnaping does not warrant a construction of the applicable statutes to allow a substantial decrease in the amount of punishment in those cases where the victim was kidnaped and robbed but suffered no physical harm.

Under the rule now stated, section 209 of the Penal Code may be applied in connection with section 1159. By the latter statutes, "The jury may find the defendant guilty of any offense, the commission of which is necessarily included in that with which he is charged. . . ." As an act of robbery now will also constitute a kidnaping, the jury may find one charged with robbery guilty of kidnaping. As a result, one who ordinarily would be subjected to a sentence for a minimum term of one year may be executed. From now on, many charges of attempted robbery, and every one of robbery, inevitably

will be prosecutions for a crime which may be punishable by death.

Unquestionably, the Legislature has the power to make either attempted robbery or robbery a capital offense. But in my opinion, considering both the language and historical background of section 209, it has not done so. A cardinal rule of statutory interpretation is that where ". . . a statute is fairly susceptible of two constructions, one leading inevitably to mischief or absurdity and the other consisting of sound sense and wise policy, the former should be rejected and the latter adopted." (*People v. Ventura Refining Co.*, 204 Cal. 286, 292 [268 P. 347, 283 P. 60]; *San Joaquin etc. Irr. Co. v. Stevinson*, 164 Cal. 221 [128 P. 924].)

As amended in 1933, section 209 provides: "Every person who seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away any individual by any means whatsoever *with intent to hold or detain, or who holds or detains*, such individual for ransom, reward or to commit extortion or robbery . . ." is punishable for kidnaping. [Italics added.] The proper construction of the statute largely turns upon the meaning of the italicized words. The prevailing opinion also stresses the words "seizes" and "confines," although each of them is consistent with the traditional concept of kidnaping, and unlike those italicized does not pertain to conduct invariably present in robbery.

As defined in Webster's New International Dictionary, Unabridged Edition (1943), the word "seize" means: "*Transitive* . . . 2.b To take possession of by force; . . . 4. To lay hold of suddenly or forcibly; . . . 5. To take prisoner; . . . *Intransitive* . . . 3. To make a snatch or clutch." Synonyms for "seize" are listed as "Catch, grip; apprehend, arrest, take, capture." The same authority defines the word "confine" as ". . . *transitive* . . . 2. To restrain within limits; to limit; . . . to shut up; imprison; to put or keep in restraint . . ." Synonyms listed are "Restrain, immure, circumscribe, compass; incarcerate, cage."

The definitions and synonyms demonstrate that the words "seizes" and "confines" are consistent with conduct which, until the present decision, has been understood to amount to kidnaping. Although proof of asportation is not necessary to sustain a conviction, nevertheless much more is required than the mere "detention" almost invariably present in attempted robbery or robbery. Words like "take prisoner," "arrest,"

"imprison," and "incarcerate" suggest the more purposeful aspect of the control exercised by the wrongdoer over the victim's person which is present in kidnaping.

As to the controversial words of section 209 designated by italics, the first clause of the statute defines the specific intent necessary to establish the crime of kidnaping. Rather than the requirement prior to 1933 that the acts be done "maliciously, forcibly or fraudulently," the amended statute declares that the acts need only be done ". . . with intent to hold or detain." None of the acts listed in the first clause is that of holding or detaining. The conduct described as constituting kidnaping is the act of seizing, confining, inveigling, enticing, decoying, abducting, concealing, kidnaping or carrying away any individual *with intent to hold or detain him.* [Italics added.] Had the Legislature intended the detention of the victim, in and of itself, to constitute kidnaping, that conduct would have been stated as the criminal act denounced, rather than being used to describe the necessary intent.

The first clause, therefore, defines as a crime any one of a series of specified acts done to ". . . any individual . . ." with the specific intent to hold or detain him. Following this clause is the disjunctive word, "or." This word introduces an alternative definition of kidnaping. One ". . . who holds or detains, *such individual* for ransom, reward or to commit extortion or robbery . . ." [italics added] is also guilty of kidnaping. The phrase ". . . who holds or detains" is qualified by the words ". . . such individual." The words "such individual" must refer to the antecedent noun, "individual," in the preceding clause. And the word "individual" in the first clause is qualified as one whom a person ". . . seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away. . . ."

Applying these plain grammatical principles, it follows that the only type of holding or detaining which may constitute kidnaping under section 209 is the holding or detaining of an individual who has previously been kidnaped in the well understood sense. It is clear that the words "holding" and "detaining" are used in the code section to extend the definition of kidnaping to one who acts as the guard or keeper of the kidnaped victim. The inclusion of the words ". . . who aids or abets . . ." reflects a superabundance of caution on the part of the Legislature, and also demonstrates an intent to make even one who aids the keeper guilty of kidnaping.

For these reasons, the language used by the Legislature

makes it clear that mere detention is not sufficient to constitute kidnaping, excepting where the detention follows a traditional act of kidnaping. Grammatically, the construction which the court has placed upon the statute is not supported by its language. And even if there were sound grammatical authority for the conclusion reached, the individual words of a statute should not be subjected to semantic dissection; the severed members are cold and lifeless without the spirit of the law.

The historical background and development of section 209 also lead to the conclusion that simple detention during an act of robbery does not constitute kidnaping. In analyzing the evolution of the legislation, it is essential to distinguish between the two statutory crimes of kidnaping which exist in California and in most modern jurisdictions. The first, and more historically orthodox form of the offense, is defined in section 207 of the Penal Code. It is, with certain modifications which harmonize its terms with modern political development, the continuation of the crime of kidnaping as it has existed since before the Christian era. (See Lardone, *Kidnaping in Roman Law*, 1 U.Det.L.J. 163-171.) At common law, as under the earlier Jewish law, kidnaping was "the forcible abduction or stealing away of a man, woman or child from . . . [his] own country, and sending . . . [him] into another." (4 Bl. Comm. [Christian Ed.] 221.) This is substantially the crime defined by section 207 as it was enacted in 1872 and has since remained without material change. (Amended Stats. 1905, p. 653, to add "carries him into another . . . county, *or into another part of the same county*.")

The second crime of kidnaping is of comparatively recent origin. Perhaps no modern crime is as deeply and inescapably attached to its historical basis as is kidnaping for pecuniary purposes, and any adequate analysis of the offense necessarily must be based upon thorough understanding and appreciation of that background.

Apparently kidnaping for ransom was unknown at common law. One of the first reported instances of the crime in this country occurred in 1874. (Ross, *The Kidnapped Child* [1876], cited and discussed in 12 N.Y.U.L.Q. Rev. 646, 649-50.) The next kidnaping for the purpose of ransom which attracted great attention was in 1900 when Edward Cudahy was abducted and $25,000 demanded for his release. (*Spreading Evil*

*—The Autobiography of Pat Crowe* [1927], cited and discussed in 12 N.Y.U.L.Q. Rev. 646, 650-51.) In the following year, one of the first of the kidnaping for ransom statutes to be enacted in the United States was adopted in Illinois, which from the outset, made kidnaping "for the purpose of extorting ransom" a capital offense. (Stats. Ill. 1901, p. 145, § 1.) Other jurisdictions enacted similar statutes, but the penalty prescribed was generally no more than life imprisonment, although uniformly well in excess of the penalty under the preexisting crime of "common-law" kidnaping, such as that defined in section 207 of the Penal Code.

In 1901 the California Legislature enacted section 209 of the Penal Code, which read: "Every person who maliciously, forcibly, or fraudulently takes or entices away any person with intent to restrain such person and thereby to commit extortion or robbery, or exact from the relatives or friends of such person any money or valuable thing, is guilty of a felony, and shall be punished therefor by imprisonment in the state's prison for life, or any number of years not less than ten." (Stats. 1901, ch. 83, p. 98.) This section differed from the majority of kidnaping for ransom or extortion statutes by enumerating robbery as an additional purpose of the unlawful act. Inasmuch as extortion, as then defined, was "the obtaining of property from another, with his consent" (Pen. Code, § 518 [enacted 1872]), quite evidently the Legislature determined that robbery should be specified as a purpose in order to include the taking of a thing of value from the person of the victim, against his will. (*People* v. *Fisher,* 30 Cal.App. 135 [157 P. 7] [promissory note and deeds to property]; *People* v. *Salter,* 59 Cal.App.2d 59 [137 P.2d 840] [combination to office safe].)

Although in the years after the first World War a number of isolated kidnapings for ransom occurred, "it was not until the latter part of 1931 that the public began to be aware of the fact that kidnapings were becoming more numerous, and that the hit-or-miss methods of the lone criminal had given away to the carefully planned activity of the professional." (Fisher & McGuire, *Kidnapping and the So-Called Lindbergh Law,* 12 N.Y.U.L.Q. Rev. 646, 652 [citing Sullivan, The Snatch Racket, 1931].) "Kidnaping appeared to have acquired some of the characteristics of a profitable and skilled profession." (Finley, *The Lindbergh Law,* 28 Georgetown L.Rev. 908, 909.) The Lindbergh kidnaping awakened the American people to the fact that a revolting crime was being generally committed

and unless the menace was met fearlessly and with determination, "the very sanction of the criminal law was threatened." (Fisher & McGuire, *Kidnapping, supra.*)

The Federal Kidnaping Act, the so-called Lindbergh Law (18 U.S.C.A. 1201; [June 22, 1932], ch. 271, § 1, 47 Stats. 326), was "drawn in 1932 against a background of organized violence. 75 Cong. Rec. 13282-13304. Kidnaping by that time had become an epidemic in the United States. Ruthless criminal bands utilized every known legal and scientific means to achieve their aims and to protect themselves. Victims were selected from among the wealthy with great care and study. Details of the seizures and detentions were fully and meticulously worked out in advance. Ransom was the usual motive." (*Chatwin* v. *United States* (1946), 326 U.S. 455, 462-3 [66 S.Ct. 233, 90 L.Ed. 198].)

It was in this nationwide atmosphere of public alarm that, in 1933, the California Legislature amended section 209 of the Penal Code to make kidnaping for ransom, reward, extortion or robbery a capital crime. During the years 1933 to 1935, similar statutes were enacted in almost all of the other states, or the punishment specified by existing statutes defining kidnaping was increased. The effectiveness of this uniform action by the various states, and particularly by the Federal government, is clearly demonstrated by the statistics which show a decrease in kidnaping and a larger percentage of convictions for the commission of this crime. (See Bomar, the Lindbergh Law, 1 Law & Contemp. Prob. 435; Fisher & McGuire, *Kidnapping, supra.*)

California is almost unique in its specification of robbery as one of the purposes for kidnaping. Other than Nevada and Arizona, where the statute is modeled upon the California code section (Nev. Comp. Laws 1931-41, Supp. vol. 2, § 10612.01; Ariz. Code Anno. [1939] vol. 3, § 43-3202), only two states in the United States specify robbery as a purpose for kidnaping. (Ark. Stats. 1947 Anno. vol. 4, § 41-2302; Wyo. Comp. Stats. 1945 Anno. vol. 1, § 9-214.) The vast majority of American jurisdictions list "ransom" or "extortion" as the dominant purpose.[1] Five states, however, follow the New

[1] 18 U.S.C.A. 1201; Colo. Stats. Anno. [1935], ch. 48, § 77(4); Gen. Stats. Conn. [1949 Rev.] vol. 3, § 8372; Dist. Col. Code [1940], § 22-2101; Fla. Stats. Anno. vol. 22, § 805.02; Ga. Code [1933], § 26-1603; Smith-Hurd Ill. Anno. Stats., ch. 38, § 386; Gen. Stats. Kans. Anno. [1935], ch. 21, art. 5, § 449; Ky. Rev. Stats. 1948, § 435.140; Anno. Laws of Mass. vol. 9, ch. 265, § 26; Mich. Stats. Anno. vol. 25, § 28.581; Mo.

York pattern of having a single crime of kidnaping, the only purpose specified being to hold or detain,[2] although in New York, Delaware and Maryland the offense, as it is broadly defined, may carry a death penalty.

Thus, although the state laws enacted during the Lindbergh era vary greatly in specific phraseology, the great body of them define the crime as kidnaping for ransom or extortion in the American gangland tradition of the early 1930's. The two exceptions to the general rule are found (1) in the New York act which, in effect, makes "common law" kidnaping, such as is defined in section 207 of our Penal Code, a capital offense; and (2) in the California statute, which includes robbery as one of the purposes of the crime.

If simple detention during robbery is kidnaping, the scope and coverage of the California and New York statutes go far beyond any normal conceptions of kidnaping for ransom. The very severity of the punishment,[3] and the revolting nature of the crimes which were the driving force behind such modern statutes, make it obvious that detention incidental to robbery is not kidnaping. These kidnaping for ransom statutes are "to be construed in the light of [their] contemporary historical background" (*Finch* v. *State*, 116 Fla. 437, 442 [156 So. 489]); and "the act must be so construed to avoid the absurd-

---

Rev. Stats. Anno. vol. 13, § 4414; Rev. Code Mont. [1935] Anno. vol. 5, § 10970.1; Rev. Stats. of Neb. [1943] vol. 2, ch. 28, § 417; N. Mex. Stats. 1941 Anno., vol. 3, § 41-2503; Gen. Stats. N. C. 1943, vol. 1, § 14-39; 10 Page's Ohio Gen. Code Anno., § 12427; Okla. Stats. Anno. [1937] title 21, § 745; Ore. Comp. Laws Anno., vol. 3, § 23-435; Purdon's Pa. Stats. Anno., tit. 18, § 4723; Gen. Laws R. I. [1938], ch. 606, § 21; Code of S. C., vol. 1, § 1122; S. D. Code [1939] vol. 1, § 13.2701; Williams Tenn. Code, vol. 7, § 10795; Vernon's Texas Pen. Code, vol. 2, art. 1177a; Utah Code Anno. [1943], vol. 5, § 103-33-1(b) (1); Virginia Code 1936 Anno., § 4407; Vermont Stats. [1947], § 8259; Remington's Rev. Stats. Wash. vol. 4, § 2410-1; W. Va. Code [1943] Anno., § 5929(3); Wis. Stats. [1943], § 340.56; Rev. Stats. Me., vol. 2, ch. 117, § 14; also Code of Ala. [1940], tit. 14, § 7; Burns Ind. Stats. Anno. vol. 4 [1942 Rep.] 10-2903; Code of Iowa [1946], vol. 2, § 706.3; La. Code of Crim. L. & Proc. [1943], art. 740-44; N.J.S.A., 2:143-1.

[2]39 McKinney's Cons. Laws of N. Y. [Pen. Code], pt. 2, § 1250; Rev. Laws of N. H. [1942], vol. 2, p. 1827; Minn. Stats. Anno. vol. 40, § 619.34; Rev. Code Del. [1935], § 5174; Anno. Code Md. [1939], vol. 1, art. 27, § 385. Possibly Washington should also be listed here as a result of judicial construction of their statute. *State* v. *Andre*, [195 Wash. 221] 80 P.2d 553; *State* v. *Berry*, [200 Wash. 495] 93 P.2d 782, noted and criticized in 38 Columb.L.Rev. 1287; 19 Ore. L.R. 301.

[3]In California, although first degree murder is punishable by death or life imprisonment (Pen. Code, § 190), kidnaping for purposes of extortion or robbery may be punished by death or life imprisonment *without possibility of parole*, if the victim suffers bodily harm. (Pen. Code, § 209.)

ity. The court must restrain the words. The object designed to be reached by the act must limit and control the literal import of the terms and phrases employed. (1 Kent's Com. 462; *Commonwealth* v. *Kimball*, 24 Pick. [Mass.] 366, 370; *United States* v. *Fisher*, 2 Cranch [358] 400 [2 L.Ed. 304].)'' (*State* v. *Clark*, 29 N.J.L. 96.)

The courts which construed the exceedingly broad language of the New York statute were among the first to recognize the reasonable limitations which must be placed upon the language used in such legislation. Thus, in *People* v. *Kuntzsch*, 64 N.Y.S. 2d 116, which was a case involving an abduction for union membership purposes during a strike, the court dismissed an indictment for kidnaping, saying: ''A literal reading of the statute makes a wilful seizure with intent to confine, against the will of the person seized, a kidnaping. Such a literal construction can be carried to absurd extremes. . . . The Court in construing the Statute should keep in mind the penalty imposed for violation of the statute. The crime is most serious.'' (64 N.Y.S.2d at 118-9; see, also, Black on Interpretation of Laws, 2d Ed. § 46, p. 129.)

The federal courts have also shown a recent tendency to retreat from their former broad construction of the intent required under the Lindbergh Law. That act specifies, ''for ransom or reward *or otherwise.*'' In *Gooch* v. *United States* (1936), 297 U.S. 124 [56 S.Ct. 395, 80 L.Ed. 522], the ''or otherwise'' clause was given a broad construction to cover non-monetary benefits. However, recently, in *Chatwin* v. *United States* (1946), 326 U.S. 455 [66 S.Ct. 233, 9 L.Ed. 198], the court considered the conviction of an advocate of polygamous ''celestial marriages,'' who was charged with taking a small girl from Utah into Mexico, going through a marriage ceremony with her and then returning to Arizona where they resided as man and wife. The prosecution was under the ''or otherwise'' clause of the Lindbergh Law. In reversing the conviction, it was said: ''The stipulated facts of this case reveal a situation quite different from the general problem to which the framers of the Federal Kidnaping Act addressed themselves. . . . Comprehensive language was used to cover every possible variety of kidnaping followed by interstate transportation . . . [but] were we to sanction a careless concept of the crime of kidnaping or were we to disregard the background and setting of the Act the boundaries of potential liability would be lost in infinity. . . . The absurdtiy of such a result, with its attendant likelihood of unfair punishment and black-

mail, is sufficient by itself to foreclose that construction." (326 U.S. at pp. 462-465.) In reaching its conclusions concerning the particular crime for which Knowles should be punished, the court attempts to dismiss the Chatwin case by saying there ". . . is no intimation that had the restraint been forcible, the transportation would not have been within the broad meaning of the 'or otherwise' clause of the federal act." This, however, does not give proper weight to the broad policy stated by the Supreme Court of the United States in refusing to ". . . sanction a careless concept of the crime of kidnapping. . . ."

Applying the rule of the Chatwin case, the facts shown in the prosecution of Knowles reveal a situation quite different from the general conduct against which the framers of the statute directed legislation. Clearly, he was a participant in an armed robbery, but only by a strained construction of section 209 may his acts be said to constitute kidnaping for the purpose of robbery. The record includes no evidence showing any plan to control the victims' whereabouts as a method of extorting money from them or their friends. The dominant act was the robbery. It could have been accomplished without requiring the victims to go into the storeroom. That movement was merely incidental to the robbery; it was a movement during the robbery, but *it was not a considered and essential prelude to the robbery*. Unquestionably, the crime Knowles committed was not kidnaping for the purpose of robbery in the sense that the Legislature intended by the enactment and amendment of section 209 of the Penal Code.

This conclusion logically follows the rationale of the cases decided when the statute enacted in 1901 was in effect. In *People* v. *Fisher* (1916), 30 Cal.App. 135 [157 P. 7], the court prefaced its statement of facts by noting that the record "reads as though it were a tale of medieval brigandage." The defendants seized the victim on the highawy and forced him to write a note to his secretary explaining his absence. They then drove him from Merced to Stockton, where he escaped and they were captured. Wire-tapping equipment, unsigned deeds to all of the victim's real property and a number of blank promissory notes were found in the automobile. This was a clear case of kidnaping for the purpose of robbery, that is, the property was to be obtained from a victim's person without his consent. Moreover, viewing the transaction in its entirety, it was an orthodox kidnaping.

The other cases which were prosecuted under the 1901 act

were decided upon similar facts. In *People* v. *Lombard* (1933), 131 Cal.App. 525 [21 P.2d 955], a conviction of attempt to commit kidnaping for purposes of ransom was sustained upon facts which showed the usual kidnap plan: a hideaway prepared, ransom notes and other preparations for extorting money. And *People* v. *Wagner* (1933), 133 Cal.App. 775 [24 P.2d 927], according to one of the defendants in the case, was ''just a case of one racket playing on another.'' The court there said that ''the object of kidnaping which is made an offense by the statute is not primarily the seizure and restraint of the victim, but the mulcting him or his relatives or friends of money or other property through coercion.'' (133 Cal.App. at p. 780.)

The first decision in which this court considered the effect of the 1933 amendment to section 209 of the Penal Code is *People* v. *Tanner* (1935), 3 Cal.2d 279 [44 P.2d 324]. The defendants believed that the victim had a large amount of cash hidden in his house. He was accosted in his car just outside his garage and was forced to reenter the house. For over an hour he was questioned, threatened, and finally tortured as the defendants attempted to find out where the ''real money'' was hidden. Finally, they became convinced that their information was incorrect and there was no large sum of money in the house. Although the asportation was slight, it was clearly connected with a prearranged plan which called for protracted holding and coercion to obtain from the victim property which would not have been available in the course of an ordinary armed robbery. This was the type of criminal conduct which the Legislature sought to prevent by making kidnaping ''for the purpose of robbery'' a capital crime.

At least four other prosecutions under the 1933 amendment may be placed within the same category. In one of them, there was a prison break in which the warden and other officials were detained for the purpose of obtaining money and clothing and to assure safe exit from the prison. The seizure and transportation was as much for the purpose of robbery as for purpose of obtaining human shields for the escape. It was all part of an organized plan to seize the victims and secure the escape.[4] (*People* v. *Kristy*, 4 Cal.2d 504 [50 P.2d 798].)

---

[4]The 1939 amendment to the extortion statute which added the language ''the obtaining of an official act of a public officer, induced by the wrongful use of force or fear,'' (Pen. Code, § 518; Am. Stats. 1939, p. 2017), would appear to more aptly bring such prison break kidnapings under the heading of ''for the purpose of extortion.''

*People* v. *Grimes,* 35 Cal.App.2d 319 [95 P.2d 486], presents an excellent example of orthodox kidnaping for ransom. A farmer's wife was taken from her home after a demand was made for $25,000 under threat that otherwise she would never be seen again. *People* v. *Salter,* 59 Cal.App.2d 59 [137 P.2d 840], concerned a situation similar to that shown in *People* v. *Tanner, supra.* The defendants seized the victim in his driveway and thereafter held him, both in his house and in a car driven about town, while they attempted to obtain from him the combination to his office safe. And the prosecution in *People* v. *Anderson,* 87 Cal.App.2d 857 [197 P.2d 839], was based upon the kidnaping for robbery of a used car dealer who was taken on a feigned demonstration ride. All of these decisions, upon their facts, affirmed judgments of conviction for seizing and carrying away a person for a purpose which could not be accomplished at the place where. he was attacked.

To ascertain the legislative intent in the amendment of section 209, reference properly may be made to Senate Bill No. 1226 and Assembly Bill No. 334 which were enacted in 1933. These bills, identical in text, were entitled ''An act to amend section 209 of the Penal Code, relating to the punishment of kidnaping.'' After the Legislature passed the assembly bill, a report on it was made to the governor by the legislative counsel, who is charged with the duty of advising him, as well as the legislators, upon pending bills and other matters (Gov. Code, §§ 10230-10245; Rule 34 of the Joint Rules of the Senate and Assembly, California Legislature, 1949). The report analyzed the proposed amendment as follows: ''This bill enlarges the definition of kidnapping. It makes the doing of the designated act or acts an offense by deleting the existing requirement that the seizure or carrying away must be done maliciously, forcibly or fraudulently, and includes within the definition one who aids or abets.''

''The existing penalty for kidnapping, upon conviction, is imprisonment in the state prison for from 10 years to life. This bill specifies . . . [greatly increased] penalties.''

The legislative counsel's opinion went to the governor while the bills were being considered by him. ''The executive is, by the constitution, a component part of the law-making power. In approving a law, he is . . . supposed to act . . . as a part of the legislative branch of the government.'' (*Fowler* v. *Peirce,* 2 Cal. 165, 172.) And the enactment of legislation requires the concurrent action not only of the two houses of the Legislature, but of the governor. (See: *Davies* v. *City of Los*

*Angeles,* 86 Cal. 37, 50 [24 P. 771].) ''While engaged in considering bills . . . presented to him for approval or disapproval, he is acting in a legislative capacity and not as an executive.'' (*Lukens* v. *Nye,* 156 Cal. 498, 501 [105 P. 593, 20 Ann.Cas. 158, 36 L.R.A.N.S. 244]. See, also, *Wright* v. *United States,* 302 U.S. 583 [58 S.Ct. 395, 82 L.Ed. 439]; *Edwards* v. *United States,* 286 U.S. 482 [52 S.Ct. 627, 76 L.Ed. 1239].) Presumably, in considering the two bills, the governor relied upon, or at least considered, the opinion of the legislative counsel. As the legislation was presented to him by his advisor, the only purpose of the amendment of section 209 was to omit the requirement that the acts specified by the statute then in effect be done maliciously and to change the penalties for kidnaping.

Since the amendment in 1933, the decisions of this court have consistently recognized the distinct characteristics of kidnaping and robbery. Before the present case, whenever the conviction of one found guilty of both kidnaping and robbery arising out of the same chain of events was upheld, the judgment as to each crime has been affirmed. By these decisions, impliedly at least, it has been held that one can commit robbery without also being guilty of kidnaping; until now the court has not held that the same act may constitute both kidnaping and robbery. The decisions are to the contrary. (*In re Pearson,* 30 Cal.2d 871 [186 P.2d 401] [kidnaping for the purpose of committing robbery and attempted robbery of one Afornin; see *People* v. *Pearson,* 41 Cal.App.2d 614, 617 [107 P.2d 463], for details]; *People* v. *Brown,* 29 Cal.2d 555 [176 P.2d 929] [kidnaping for the purpose of robbery and robbery of one Mrs. Jacobs]; *People* v. *Dorman,* 28 Cal.2d 846 [172 P.2d 686] [kidnaping for the purpose of robbery and robbery of one Bigelow]; *People* v. *Britton,* 6 Cal.2d 8 [56 P.2d 493] [one charge of kidnaping for the purpose of robbery and two charges of robbery]; *People* v. *Kristy,* 4 Cal.2d 504 [50 P.2d 798] [four counts of kidnaping for the purpose of robbery and four counts of robbery]; *People* v. *Tanner,* 3 Cal.2d 279 [44 P.2d 324] [two counts of kidnaping and two counts of robbery of one Bodkin and his wife].)

In *People* v. *Dorman, supra,* the defendant was convicted upon one count for murder, one count for kidnaping for the purpose of robbery, and three counts for robbery. In affirming the judgment, Justice Shenk discussed ''. . . the undisputed acts of transporting Bigelow to an isolated spot, and

robbing him'' as sufficient evidence to support each of the convictions.

A later case is *People* v. *Brown, supra,* in which Justice Traynor spoke for the court in affirming convictions for two counts of robbery and one of kidnaping for the purpose of robbery, where the victim suffered bodily harm. The most recent decision is *In re Pearson, supra,* in which a petition for a writ of habeas corpus was denied one imprisoned following convictions for kidnaping and attempted robbery based upon the same facts. At page 878 of the opinion, Justice Schauer stated as to the conviction for kidnaping, ''Petitioner is legally imprisoned for life without possibility of parole under a judgment verdict which so fixes his punishment.''

By the present decision, the court *sub silentio* has overruled the cases cited. And if since 1933 an act of robbery has also constituted kidnaping, the defendants in those cases were entitled to the same relief now given Knowles.

The majority opinion attempts to distinguish the prior decisions upon the ground that, in each of them, ''. . . the acts that formed the basis of the kidnaping conviction were separate from those that involved the actual taking of property. . . .'' If this be true, the present case apparently is the first one in reported California legal history where there were inseparable acts of robbery and kidnaping. Furthermore, assuming that the records upon which convictions for robbery and kidnaping for the purpose of robbery were affirmed by this court showed separable acts constituting these crimes, the decisions in those cases are entirely inconsistent with the conclusions now reached. It cannot be said with any certainty whether the triers of fact placed the judgments of conviction upon evidence of the incidental detention necessary to relieve the victims of their property, or upon testimony concerning the defendants' conduct not directly connected with the robberies. As now stated, every robbery is a kidnaping because of such incidental detention and one is unable to say which act the jury relied upon as the basis for its verdict of guilty of kidnaping. If in the prior cases the juries determined that there was detention incidental to robbery and based the convictions for the kidnapings upon that evidence, then, as here, the judgment of conviction for robbery should have been reversed. This is true because, under the new formula, either the evidence as to detention incidental to robbery or that concerning an independent act unrelated to robbery would support the judgment of conviction for kidnaping. And applying

section 654 of the Penal Code as used in the majority opinion, where, as in the present case, the conviction for robbery and for kidnaping for the purpose of robbery are based upon the robbery alone, the conviction of the lesser crime should have been set aside.

To summarize my conclusions, the grammatical construction and language of the statute, the legislative history and development of section 209, and the legislative intent as derived from the history and circumstances surrounding the enactment of the 1933 amendment clearly show that one can commit robbery without also being guilty of kidnaping. Considering particularly the facts shown by the present record, I see no basis whatever for holding that one who moves his victim within the immediate zone of the crime merely to facilitate the robbery, or detains him briefly in order to obtain property from him, is guilty of kidnaping.

Otherwise stated, if there be detention alone, it must follow a traditional act of kidnaping in order to render the one detaining guilty of that crime. It is true that section 209 does not in every case require asportation, although that is an element usually present in kidnaping. But the seizure, confinement, inveigling, enticing, decoying, abducting, concealing, kidnaping or carrying away must be done, as the words themselves demonstrate, to control the victim's whereabouts for the purpose of robbery or extortion. If the defendant's control of the location of the victim's person is purely transitory or incidental, as in the ordinary robbery, the crime is not kidnaping.

I would reverse the judgments of conviction for kidnaping, and affirm the judgments of conviction for robbery.

Gibson, C. J., concurred.

CARTER, J., Dissenting.—I am in full accord with the views expressed in the dissenting opinion of Mr. Justice Edmonds, but feel that something further should be said in regard to the holding in the majority opinion. It is there held that a robbery is also a violation of section 209 of the Penal Code, called "kidnapping." The prosecuting attorney is given the sole and arbitrary power to determine whether a person shall suffer life imprisonment without possibility of parole or even death on the one hand, or, in the case of robbery in the second degree, as little as one year's imprisonment. It all depends on the charge he chooses, at his whim or caprice,

to make against the accused. If he charges both robbery and kidnapping and the defendant is convicted of both crimes, he must suffer the greater punishment provided for kidnapping, or, if he wishes, he may charge kidnapping alone and likewise obtain the extreme penalty. However, he may charge robbery alone, and, in case of a conviction, lesser punishment would follow. All these things could occur on the identical set of facts which establish only·robbery as will later appear. It is not to be supposed that the Legislature intended to place any such drastic and arbitrary power in the hands of the district attorney. On the contrary, it is clear that it did not intend to embrace the crime of robbery in section 209 of the Penal Code. Every robbery, whether first or second degree, necessarily involves some detention or holding of the victim if we give those words a narrow and restricted meaning. The Legislature has carefully defined robbery and fixed its punishment, deeming that punishment adequate. If it had intended to depart from those provisions, it would have done so directly by amending the robbery statute. It would not have attempted to achieve that result by amending section 209, the kidnap statute. The case falls squarely within *In re Shull*, 23 Cal.2d 745 [146 P.2d 417], where this court held that a statute imposing an additional five-year term of imprisonment where a felony was committed with a deadly weapon was not intended to apply to the felony of assault with a deadly weapon, for the elements in both instances were the same and the punishment for the latter was clearly defined. It is there said: ''It is not unreasonable to suppose that the Legislature believed that for felonies in which the use of a gun was not one of the essential factors, such as rape, larceny, and the like, an added penalty should be imposed by reason of the fact that the defendant being armed with such a weapon would probably be more dangerous because of the probability of death or physical injury being inflicted by the weapon. Hence, such a condition would be reasonable grounds for increasing the penalty where felonies are involved which do not include as a necessary element being armed with a pistol. The Legislature has by other acts imposed an increased punishment where the only additional factor, being armed with a deadly weapon, is present. The only difference between a simple assault and one with a deadly weapon is the latter factor. The commission of a simple assault is declared a misdemeanor, and the punishment therefor is a fine of not over $500 or imprisonment in the county jail for six months, or by both. (Pen. Code, §§ 240,

241.) When there is added to the assault the use of a deadly weapon the punishment is increased to imprisonment in the state prison not exceeding ten years or in the county jail not exceeding one year or a fine not exceeding $5,000 or by both fine and imprisonment (Pen. Code, § 245), and if section 1168(2)(a) or 3024(2) is applicable and the weapons therein mentioned are used, the *minimum* term is fixed at five years where the perpetrator is not one previously convicted of a felony. Briefly, the Legislature has fixed the punishment for an assault where a deadly weapon is used, a particular crime, and it is not to be supposed that for the same offense without any additional factor existing the added punishment should be imposed. In felonies where a deadly weapon is not a factor in the offense, the additional punishment is imposed by section 3 of the Deadly Weapons Act, because of the additional factor of a deadly weapon being involved.''

Applying the foregoing rule to the case at bar, it seems obvious to me that by the amendment to section 209 of the Penal Code the Legislature did not intend to make the punishment for kidnapping applicable to robbery, but such is the holding of the majority in this case.

Appellant's petition for a rehearing was denied May 18, 1950. Gibson, C. J., Edmonds, J., and Carter, J., voted for a rehearing.